IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

LIFE ALARM SYSTEMS, INC.,          *
                                   *
            Plaintiff,             *
                                   *
      v.                           *          CV 109-117
                                   *
VALUED RELATIONSHIPS, INC.         *
and  CHRIS HENDRIKSEN,             *
                                   *
            Defendants.            *

---

**O R D E R**

---

On August 27, 2009, Plaintiff filed a complaint against
Defendants in the Superior Court of Richmond County, Georgia,
alleging claims of tortious interference.  (Doc. no. 1, Ex. 1.)
Defendants removed the case to this Court and subsequently filed
an answer within which they raised several counterclaims against
Plaintiff.  (Doc. no. 4.)  The action is currently before the
Court on Defendants' motion for partial summary judgment.  (Doc.
no. 18.)

## I. BACKGROUND

Defendant Valued Relationships, Inc. ("VRI") is an Ohio
corporation that provides, *inter alia*, health monitoring
services to senior citizens and individuals with disabilities.
(Hendriksen Dep. at 9 & 14.)    Christopher Hendriksen

("Hendriksen"), the other defendant in this action, is the current president of VRI and has held this position since October of 2007. (Id. at 7.) Prior to this time, Darren Torrence served as VRI's president. (Id. at 10.)

VRI's health monitoring services include the leasing and monitoring of personal emergency response units ("PERS units"). (Id. at 9 & 14.) PERS units are placed in a consumer's home and allow the consumer to immediately contact a monitoring center during an emergency, typically by pressing a button, at which time the monitoring center will contact emergency personnel. (Id.) VRI leases these units to consumers and government agencies, as well as distributors who, in turn, sublease or sell the devices to consumers. (Id. at 14–15.)

Life Alarm Services ("Life Alarm") is a Georgia corporation, owned and operated by Ron Perry ("Perry"), which also provides personal emergency response services. (Perry Dep. at 13 & 16.) Life Alarm supplies its customers with PERS units and contracts with other companies, like VRI, for the provision of monitoring services. (Id. at 19 & 32.)

This lawsuit arises out of the business relationship between VRI and Life Alarm. This relationship, including its demise, is detailed in full below.

## A. Equipment Leases

Between November 14, 2005, and January 5, 2007, Life Alarm entered into nine equipment leases with VRI. (Doc. no. 19, Ex. 2 at 1-80.) Each lease has a term of thirty-six months and provides for the lease of one-hundred (100) PERS units to Life Alarm. (Id.) Equal payments are to be made by Life Alarm every month for the duration of the leases, and a "final payoff payment" of $100 is due at the conclusion of each thirty-six month term.[1] (Id.)

Each lease provides that, in the event that Life Alarm defaults and VRI provides requisite notice, VRI is entitled to do the following:

> (1) To terminate the Equipment Lease and Lessee's rights under the Equipment Lease;
>
> (2) To declare the balance of all unpaid rent and all other charges of any kind required of Lessee under the Equipment Lease to be due and payable immediately, in which event Lessor shall be entitled to the balance due together with interest at the rate of 15% from the

---

[1] There is some dispute as to whether these were capital lease agreements, meaning that ownership was intended to transfer at the conclusion of the lease term. All the equipment leases at issue in this case include an attached "Exhibit B," which contains the following language addressing "lease payments:" "36 monthly payments due per exhibit A totaling $395 or $3.95 per unit; Final payoff payment of $100; Ownership to transfer at final payment." (Doc. no. 19, Ex. 2 at 1-80.) Defendants interpret this final provision to mean "Ownership [of the equipment would] transfer [to VRI] at final payment;" in other words, Defendants contend that Plaintiff was never to obtain an ownership interest in any equipment under the leases. (Doc. no. 18, Ex. 2 at 2.) Defendants' interpretation is presumably based upon a prior provision in the leases that states, in part, "[t]he Lessor shall at all times be the sole owner of the Equipment." (See, e.g., Doc. no. 19, Ex. 2 at 2.) Plaintiff, however, disputes Defendants' interpretation (see doc. no. 25 at 2) based upon the plain language of the contract and the testimony of Chris Hendriksen, who expressly stated during his deposition that Life Alarm was "renting to own" the units pursuant to "capital lease agreements." (Hendriksen Dep. at 45.)

3

date of notification of default to the date of payment;

(3) To repossess the Equipment without legal process free of all rights of the Lessee in and to the Equipment. Lessee authorizes Lessor or Lessor's agent to enter upon the premises where the Equipment is located and repossess and remove it. Lessee specifically waives any right of action Lessee might otherwise have arising out of the entry and repossession, and releases Lessor from any claim for trespass or damage caused by reason of the entry, repossession, or removal.

(Id.) In addition, the leases provide that Life Alarm must reimburse VRI "for all reasonable expenses of repossession and enforcement of Lessor's rights and remedies," including, but not limited to, reasonable attorney's fees incurred as a result of a collection action. (Id.)

## B. Monitoring Agreement

On November 14, 2005, Life Alarm entered into a three-year Monitoring Services Agreement ("Monitoring Agreement") with VRI.[2] (See Doc. no. 21, Ex. 1 at 1-5.) Pursuant to the agreement, VRI was to provide twenty-four hour home monitoring services for emergency assistance to Life Alarm's individual clients in exchange for $4.00 payments per month for every unit monitored. (Id. at 1-2.) This $4.00 rate is guaranteed for the entire

---

[2] The term language in the agreement reads as follows: "This agreement shall have a term of three years and renew annually thereafter for one year terms, unless written notification is made by one party to the other as to the cancellation or modification at least 30 days in advance of renewal date." (Doc. no. 21, Ex. 1 at 4.) The agreement further states that it is to be "governed by, construed, and enforced in accordance with the law of the State of Ohio." (Id.)

three-year term and can only be modified upon renewal, provided Life Alarm receives 60 days advance notice. (Id. at 4.)

The agreement further states that Life Alarm is "responsible for payment of [the] fees regardless of any fees it does or does not collect from its subscribers" and provides as follows with regard to default:

> If [Life Alarm] should be more than 60 days past due, [VRI] may at its option cease services to subscribers upon notice to subscriber and [Life Alarm], or begin billing directly to subscribers, neither of which shall be construed as relieving [Life Alarm] of its obligation to pay in accordance [with the agreement].

(Id. at 2 & 4.) The agreement also states that Life Alarm shall "indemnify and hold harmless" VRI and its employees[3] against "any and all liability, claims, damages, suits, demands, expenses and costs (including but not limited to court costs and reasonable attorneys' fees) of every kind arising out of or in consequence" of Life Alarm's breach of the agreement, whether such breach is the result of negligence or willful misconduct. (Id.)

### C. Billing, Payments, and Default

During the course of its business relationship with Life Alarm, VRI would send Perry separate monthly invoices for each of the active equipment leases and the monitoring services. (Perry Dep. at 119.) Rather than writing individual checks for

---

[3] Specifically, the agreement provides that Life Alarm shall indemnify and hold harmless the following parties: "[VRI], its officers, directors, shareholders, agents, employees, subsidiaries, [and] parent and affiliate corporations." (Id. at 3.)

each particular invoice, Perry would send a single check to be applied towards all of his debt.[4] (Id. at 119-21.) When VRI received such lump sum payments, it would first check if there was a specific invoice number listed on the check or any other indication as to how the client wished to have the money distributed among various accounts. (Hendriksen Dep. at 69-70.) If the client provided no direction and the amount of the check did not correspond to a specific invoice, VRI would apply the payment to the client's debt as follows: monitoring fees from oldest to newest and then lease payments from oldest to newest. (Id.)

VRI has provided evidence that Life Alarm was "chronically in arrears" on its obligations under the leases and the Monitoring Agreement.[5] (Hendriksen Aff. ¶ 4-5; Doc. no. 19, Ex. 2 at 81-99.) Consequently, in August of 2009, VRI notified Life Alarm that it was in default, provided detailed information regarding its debt at that time ($28,235.79), and attempted to negotiate an amicable resolution. (See Doc. no. 19, Ex. 2 at 81-95.) As part of the negotiations, VRI sent Life Alarm a

---

[4] Perry did not designate how these lump sum payments were to be applied to his account. (Perry Dep. at 121.)

[5] Perry acknowledges that Life Alarm was behind on payments in August of 2008 (Perry Dep. at 134) and wrote checks "for what [he] had" (id. at 129). Furthermore, Life Alarm's Complaint expressly states that "in August of 2008 and continuing through the summer of 2009 Plaintiff fell behind in his payments to [VRI] under the Leases." (Compl. ¶ 8.) While Perry does not expressly acknowledge that he regularly paid VRI less than the total amount of his monthly invoices, he does not deny this either. (See, e.g., Perry Dep. at 118-19, 126-27.) More importantly, Life Alarm has pointed to no evidence indicating that it fully satisfied its payment obligations during the period in question.

6

letter dated August 13, 2009, within which VRI proposed instituting a payment plan of $6000.00 per month. (Id. at 88-92.) In response, Perry, without expressly disputing the amount owed, indicated he could only pay $2000.00 for the month of September, and would pay more each month if he had the funds available to do so.[6] (Doc. no. 21, Ex. 1 at 21-25; Perry Dep. at 164-65.) VRI rejected Life Alarm's offer and indicated by letter dated August 18, 2009, that, pursuant to the Monitoring Agreement, VRI planned to begin contacting Life Alarm's clients to arrange a direct relationship with them or to recover equipment if a customer no longer wished to continue receiving VRI's services. (Doc. no. 19, Ex. 2 at 93-94.) VRI further informed Life Alarm that these actions would not extinguish its obligation to pay VRI for services rendered and its outstanding debt. (Id. at 94.)

### D. VRI Solicits Life Alarm's Customers

As it stated it would do in the August 18, 2009 letter, VRI began contacting Life Alarm's customers directly, via telephone,[7] and followed up with written letters. (Hendriksen Dep. at 118.) The form letter states that VRI is no longer working with Life

---

[6] In his response, Perry stated that he "realize[s] the outstanding balance" and noted that "it is going to take time to pay it." (Doc. no. 21, Ex. 1 at 22.)

[7] Hendriksen created a list of talking points that was used by VRI employees who communicated with Life Alarm's customers. (Hendriksen Dep. at 118.) On occasion, Hendriksen would follow up personally with customers who had substantial concerns or confusion regarding the transition process. (Id. at 121.)

Alarm and explains to customers that they can keep their current medical alert system and support center by making payments directly to VRI. (Doc. no. 19, Ex. 2 at 96.) The letter also states that customers are free to change providers, but those customers who choose to do so are required to return their medical alert system to VRI. (Id.)

Upon learning of VRI's direct contact with Life Alarm customers, Perry sent an email to Hendriksen requesting that VRI "cease and desist." (Doc. no. 21, Ex. 1 at 24.) VRI, however, continued pursuing these customers, and Life Alarm ultimately initiated the present action.

### E. Current Action

Life Alarm's Complaint contains three separate counts: (1) a request for a temporary restraining order, preliminary injunction and permanent injunction; (2) a claim for tortious interference with contractual relations; and (3) a claim for tortious interference with business relations. (Doc. no. 1, Ex. 2.) Life Alarm specifically alleges that Defendants had a duty not to interfere with its private contractual and non-contractual relationships with its clients and contends that Defendants' breach of this duty was the direct and proximate cause of severe damage to Life Alarm's business. (Compl. ¶¶ 23 & 30.) Life Alarm further alleges that Defendants have "both in

writing and verbally stated to [Life Alarm's clients] that [it] is a bogus and insolvent company." (Id. ¶ 16.)

In their Answer, Defendants deny that their actions constitute tortious interference of any kind. (Doc. no. 4.) Moreover, Defendants have asserted their own claims against Life Alarm, which include: (1) breach of leases; (2) breach of Monitoring Agreement; (3) tortious interference with contractual and business relations; (4) deprivation of personalty; and (5) replevin and preliminary injunction. These claims all arise out of Life Alarm's alleged failure to fully pay for services and equipment provided by VRI, as well as Life Alarm's response to VRI's solicitation of its clients.[8]

Defendants filed a motion for partial summary judgment on May 18, 2010. (Doc. no. 18.) Defendants seek summary judgment on all of Life Alarm's claims, as well as on their counterclaims for breach of the equipment leases and the Monitoring Agreement. Defendants argue that VRI was not a "stranger" to Life Alarm's relationships with its clients, which Georgia law requires in order to establish a claim for tortious interference. (Doc. no. 18, Ex. 2 at 7.) Furthermore, Defendants argue that because VRI's actions were authorized under the Monitoring Agreement,

---

[8] Defendants allege that Life Alarm refused to acknowledge VRI's rights under the Monitoring Agreement, actively attempted to convince subscribers that they needed to transfer to other monitoring facilities, and made false and disparaging statements about VRI. (Doc. no. 4 at 8.) Defendants also contend that Life Alarm unlawfully reconfigured VRI's PERS equipment (or replaced it entirely) and has refused to return equipment that rightfully belongs to VRI. (Id. at 10.)

VRI could not have acted with the intent necessary to sustain a tortious interference claim. (Id. at 10.) As to the claims against Hendriksen, Defendants contend that he cannot be held liable because his actions were all performed within the scope of his duties as president of VRI. (Id. at 11.)

Finally, Defendants seek summary judgment as to their breach claims and their related claim for attorney's fees. (Id. at 12-18.) Defendants assert that Life Alarm is unable to point to any evidence that would create a genuine issue of material fact as to the amount owed and argues that it is entitled to reasonable attorney's fees and costs based upon the clear language of the agreements at issue. (Id.)

## II. SUMMARY JUDGMENT STANDARD

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop. in

Greene and Tuscaloosa Cntys., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes

11

summary judgment." Id. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for partial summary judgment and informed it of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 22.) Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam),

are satisfied. The time for filing materials in opposition has expired, and the motions are now ripe for consideration.

### III. DISCUSSION

**A.  VRI's contact with Life Alarm's clients was privileged and permitted under the Monitoring Agreement.**

In order to prevail on a claim for tortious interference with business or contractual relations, a plaintiff must show evidence of the following:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Disaster Servs., Inc. v. ERC P'ship, 228 Ga. App. 739, 740 (1997) (citations omitted).

With regard to the first element, "privilege" has been defined as any "legitimate economic interests of the defendant or a legitimate relationship of the defendant to the contract, so that it is not considered a stranger, interloper, or meddler." Id. at 741. Thus, a plaintiff in an action for tortious interference carries the burden of showing that the defendant was a "meddler," "interloper," or "stranger" to the contract or business relationship at issue. BMC v. Ceebraid-Signal Corp., No. 1:05-cv-1149, 2007 WL 2126272, at *7 (N.D. Ga.

13

July 23, 2007). This is commonly referred to as the "stranger doctrine" and applies equally to claims of tortious interference with both business and contractual relationships. Atlanta Mkt. Ctr. Mgmt. Co. v. Equitable Real Estate Inv. Mgmt., Inc., 269 Ga. 604, 609 n.2 (1998).

Pursuant to this doctrine, an entity cannot be held liable for tortious interference unless it is "a stranger to both the contract at issue *and* the business relationship giving rise to and underpinning the contract." Id. Accordingly, "all parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships." Id.

In a conclusory fashion, Life Alarm argues that the "relationship between VRI and Plaintiff does not correlate in any way to a relationship between VRI and Plaintiff's former customers."[9] (Doc. no. 25 at 6.) In support thereof, Life Alarm notes that Hendriksen, VRI's company president, acknowledged during his deposition that VRI had no contractual relationship

---

[9] Life Alarm cites a single case in support of its argument on this particular issue, Britt Paulk Ins. Agency, Inc. v. Vandroff Ins. Agency, 952 F. Supp. 1575, 1583 (N.D. Ga. 1996), which states that, "[a]s a general rule, the determination as to whether a defendant has tortiously interfered with a plaintiff's contractual or business relations is a question properly reserved for the jury." The Court notes that while this may be the "general rule," Georgia courts regularly grant summary judgment in actions for tortious interference, and these decisions are often based upon the same issues raised by Defendants. See, e.g., Disaster Servs., 228 Ga. App. at 741 (affirming trial judge's grant of summary judgment in tortious interference action because defendant's actions were proper and privileged); Renden, Inc. v. Liberty Real Estate Ltd. P'ship III, 213 Ga. App. 333, 335 (1994) (affirming trial court's grant of summary judgment because there was no evidence of malice or intent to injure and defendant was not a stranger to the relationship at issue).

with Life Alarm's customers until after VRI began contacting them and convincing them to start paying VRI directly. (Id.; Hendriksen Dep. at 164.) Life Alarm also cites Hendriksen's statement that, under VRI's contracts with Life Alarm, Life Alarm was required to pay VRI whether or not it received payments from its customers. (Hendriksen Dep. at 116.)

Life Alarm appears to be arguing that because VRI did not have a *direct* contractual relationship with Life Alarm's customers and did not *directly* receive payments from them, VRI was a "stranger" to the contracts and business relationships at issue. Life Alarm misconstrues the law; such a direct relationship is not necessary when there is "an interwoven contractual arrangement," Atl. Mkt., 269 Ga. at 609, as there is here. See BMC, 2007 WL 2126272, at *23 ("The 'stranger doctrine' protects from liability more entities than just those who are parties to the agreement: '[o]ne is not a stranger to the contract just because one is not a party to the contract.'" (citation omitted)).

For instance, in Pruitt Corp. v. Strahley, 270 Ga. 430, 430 (1999), a psychologist entered into one-year contracts with two nursing homes to provide counseling services to their residents. The psychologist provided these services for the entire duration of the contracts, and, after they expired, continued to work with the residents. Id. At some point after the contracts expired, the nursing homes began limiting the psychologist's

15

access to the residents and eventually forbade him from providing any psychological services at all. Id. The psychologist subsequently sued the owner of the nursing homes for tortious interference with contractual and business relationships. Id.

The Georgia Supreme Court, reversing a Georgia Court of Appeals decision, held that the psychologist and the owner of the nursing homes were parties to an "interwoven contractual relationship in which each was responsible, and provided care, for the residents." Id. Several Georgia courts have come to the same conclusion when faced with similar facts. See, e.g., Taylor v. Calvary Babtist Temple, 279 Ga. App. 71, 72-73 (2006) (granting summary judgment against teacher who was fired from school and was later prohibited by the school from independently teaching SAT class to former students); Renden, 213 Ga. App. at 334 (granting summary judgment based upon fact that lessor was not a stranger to business relationship between lessee and potential subleasee).

The relationships at issue here are similar to those that existed in the above cases. Not only did VRI provide the PERS units that Life Alarm's customers used, but these customers also received monitoring services directly from VRI. Every time Life Alarm's customers had an emergency and activated their PERS units, the signal would go directly to VRI, which would then contact emergency personnel. Thus, VRI and Life Alarm were,

16

together, responsible for ensuring that Life Alarm's customers had twenty-four hour, single-button access to emergency services.[10]

More importantly, VRI had a contractual right to directly bill Life Alarm's clients in the event that Life Alarm defaulted under the Monitoring Agreement.[11]    This agreement reads as follows:

> If [Life Alarm] should be more than 60 days past due, [VRI] may at its option cease services to subscribers upon notice to subscriber and [Life Alarm], **or begin billing directly to subscribers**, neither of which shall be construed as relieving [Life Alarm] of its obligation to pay in accordance to the terms of this Agreement.

(Doc. no. 21, Ex. 1 at 2 (emphasis added).)

In sum, it is this Court's determination that VRI had a legitimate economic interest in, and a legitimate relationship with, Life Alarm's clients, such that VRI cannot be considered a "stranger" for purposes of Life Alarm's tortious interference claims.    Because Life Alarm has proven unable to establish that there is a genuine issue of fact as to whether VRI was a "stranger" to Life Alarm's business and contractual

---

[10] Furthermore, implying that VRI had no financial interest in Life Alarm's relationship with its clients merely because VRI never received direct payment from them largely ignores the realities of VRI's role.    As stated above, VRI provided monitoring services directly to Life Alarm's clients and, in exchange for these services, received monthly payments for each individual unit monitored.    Failure to provide these services to Life Alarm's clients in the manner in which it had agreed would not only constitute a breach of its agreement with Life Alarm, likely leading to a discontinuation of service and a substantial loss of income, but would also jeopardize the clients' lives and potentially expose VRI to liability.

[11] In its response to this particular argument, Life Alarm completely ignores this contractual provision.

relationships with its clients, summary judgment is appropriate. Accordingly, Defendants' motion for summary judgment as to Life Alarm's claims of tortious interference is hereby **GRANTED**.

**B.    There is no evidence showing that Hendriksen acted outside the scope of his employment.**

Life Alarm contends that Hendriksen, as the person responsible for organizing VRI's direct contact with Life Alarm's clients, should be held individually liable for tortious interference with contractual and business relations. Defendants argue, however, that because VRI was not a stranger to the contractual and business relationships at issue in this lawsuit, Hendriksen can only be liable for acts performed outside the scope of his employment. (Doc. no. 18, Ex. 2 at 11-12.)    According to Defendants, there is no evidence of such acts.    The Court agrees.

When a company has a legitimate interest in a particular business or contractual relationship, meaning it cannot be considered a "stranger" or "intermeddler," its employees cannot be held individually liable for acts that may affect the relationship if those acts were performed within the scope of their employment.    See Clark v. Marietta Surgical Ctr., Inc., No. 1:97-cv-07, 1999 U.S. Dist. LEXIS 19910, at *29-*30 (N.D. Ga. Mar. 18, 1999) ("There are some circumstances in which an employee of a company with a legitimate interest in the business

18

relationship can be found individually liable [for tortious interference] if he or she acts outside the scope of employment."); see also Energy Contractors, Inc. v. Ga. Metal Sys. & Eng'g, Inc., 186 Ga. App. 475, 478 (1988) (finding that where corporation was not stranger to contract at issue its president could not be held individually liable for tortious interference without evidence that he acted outside the scope of his employment). Put simply, an employee is protected by his or her employer's privilege unless that employee acted beyond the scope of his or her employment. See Marietta Surgical Ctr., 1999 U.S. Dist. LEXIS 19910 at *31.

Plaintiff neither argues nor presents any evidence demonstrating that Hendriksen's actions were beyond the scope of his employment with VRI.[12] The record indisputably shows that Hendriksen acted pursuant to a contract executed by VRI and Life Alarm and solicited customers for the direct benefit of VRI. These actions fit squarely within the scope of Hendriksen's employment as president of VRI and are largely the same actions the Court held were privileged in the previous section.

---

[12] With regard to the claims against Hendriksen, Life Alarm cites a single case in opposition to Defendants' motion, GIW Indus., Inc. v. Jer-Peg Contracting, Inc., 530 F. Supp. 2d 1323 (S.D. Ga. 2008). Life Alarm cites this case for the following proposition: "A corporate officer who takes part in the commission of a tort by a corporation is personally liable therefore . . . ." Id. at 1339. While this is an accurate statement of the law, it does not apply here because VRI's conduct was privileged.

19

Based upon the foregoing, Defendants' motion for summary judgment as to Life Alarm's claims against Hendriksen is **GRANTED**.

### C. Life Alarm is in default of its obligation under the equipment leases and the Monitoring Agreement.

In addition to moving for summary judgment on all of Life Alarm's claims, Defendants have also moved for summary judgment on Counts One and Two of their counterclaims for breach of the leases and the Monitoring Agreement. Defendants contend that there is no dispute as to whether Plaintiff is in default and owes VRI $54,269.89. (Doc. no. 18, Ex. 2 at 12-17.) In support thereof, Defendants cite the affidavit of VRI's president, Chris Hendriksen, and the documents attached thereto, which set forth in detail the amounts owed by Life Alarm. (See Doc. no. 19, Exs. 1 & 2.)

In response, Life Alarm disputes the amount allegedly owed, but does so with minimal specificity and no legitimate legal basis. Life Alarm's response relies almost exclusively on a single paragraph in Perry's affidavit,[13] which reads, in part, as follows:

---

[13] The Court notes that Life Alarm also argues in its response that VRI has continued charging Life Alarm for the monitoring of certain PERS devices after Life Alarm specifically requested that VRI cease monitoring these devices. (Doc. no. 25 at 9-10.) While this certainly may have been the case, these charges are not at issue here. Hendriksen states explicitly in his affidavit that the $54,269.89 amount VRI seeks does not include any charges for monitoring services provided after VRI received a disconnect request from Life Alarm. (Hendriksen Aff. ¶ 16.) In opposition, Plaintiff points to no evidence to dispute this.

I dispute the amounts they claim are owed and the manner in which my payments were applied between the afore-mentioned leases and the afore-mentioned monitoring agreement. The monitoring agreement was originally for a term of three years and became month-to-month in 2008. In December of 2008 VRI unilaterally raised the monitoring rate from $4.00 per month to $6.00 per month. This increase was in spite of the fact that the Agreement required 60 day notice for a rate change. . . . Life Alarm has always made or attempted to make timely and proper payments to VRI for any proper amounts due under our various agreements.

(Perry Aff. ¶ 6.)

Notably, Perry never specifies what amount, if any, is owed, nor does he state that Life Alarm is current and owes nothing.[14] Furthermore, Life Alarm's conclusory allegations that VRI acted improperly are legally and factually baseless. For instance, Perry disputes "the manner in which [his] payments were applied between the afore-mentioned leases and the afore-mentioned monitoring agreement." (Id.) As described in detail above, Life Alarm received multiple invoices each month from

---

[14] This is consistent with Perry's deposition testimony, during which he repeatedly avoided providing substantive answers to questions addressing the specific amount owed. When asked to identify any proof he had to refute VRI's contention that Life Alarm had defaulted on its obligations, the following dialogue took place between Perry and the opposing counsel:

Q: I understand you don't believe [VRI]. But prove to the judge that you don't owe this and tell the judge what you do owe. How are we going to do that?

A: Maybe we'll be able to do it by the court date, but I can't do it today.

Q: What will you do when it's time to go to court?

A: I'll pray.

(Perry Dep. at 161-62.)

VRI, but Perry made his payments in lump sums. (Perry Dep. at 121.) Perry admitted during his deposition that his checks to VRI did not designate how they were to be applied to the multiple leases and the Monitoring Agreement; in addition, Perry has proven unwilling or unable to state how VRI should have distributed the lump sum payments among the various accounts. (Id. at 121-22.) More importantly, Life Alarm points to no provision within any of the agreements or any other factual or legal basis upon which it could be argued that VRI was bound to apply Life Alarm's lump sum payments in any particular way.

As for Life Alarm's contention that "VRI unilaterally raised the monitoring rate from $4.00 per month to $6.00 per month," Life Alarm has failed to provide any evidence or law showing that this action was improper. The Monitoring Agreement, dated November 14, 2005, specifically allowed for a rate increase upon renewal as long as VRI gave a minimum of 60 days advance notice, and Defendants have submitted evidence showing they timely provided the requisite notice.

Defendants' evidence is a September 28, 2008 email from Darren Torrence, the former president and owner of VRI, to Perry. In this email, Torrence explicitly notifies Perry of the upcoming rate change. The email reads as follows:

> Our initial monitoring contract is coming to renewal. I wanted to give you a heads up that your monitoring rate will be increasing. We originally signed you on with the promise of big numbers, several thousand units, and committed to doing the leasing as well.

22

The volume never really panned out because you started putting units on line with a different center. As of the contract renewal your monthly fee will increase to $6 a month which is our bottom rate right now. We do have additional costs to cover with fuel price increases, etc.

I know increases are never well received and I wish this wasn't the case but it doesn't make sense for us to continue on at your current rate. You do of course have the option of cancelling the contract prior to renewal and moving the accounts to another center if you like, and we would have no problem and part friends if you choose to go that direction. You would need to make arrangements to pay off the leases to proceed.

The increase would be effective with the December billing so you have a couple of months to make a decision and make any changes needed.

(Doc. no. 30, Ex. 1 at 1.)

In response, Plaintiff provides no legal basis as to why this notice is insufficient. Moreover, Perry, at no point, has denied that he received this email, which was sent to an email address Perry has used to send messages to and receive messages from VRI as recently as August 19, 2009. (See Doc. no. 21, Ex. 1 at 21-24.) In fact, Perry appears to deliberately avoid making an express denial in his affidavit while simultaneously attempting to imply that no notice was given by stating, "[t]his increase was in spite of the fact that the Agreement required 60 day notice for a rate change." (Perry Aff. ¶ 6.) Furthermore, when faced with this issue at his deposition, Perry could only say that he did not remember receiving the email.[15]

---

[15] The relevant exchange between Perry and the opposing counsel went as follows:

> [A] witness who states that he cannot remember whether
> or not an event alleged to have happened by the moving
> party actually took place does not help the nonmoving
> party to meet its burden. The nonmoving party must
> come up with evidence that negates the version of
> events alleged by the moving party—an acknowledgement
> that the event may have occurred, but the witness
> cannot remember is not enough.

Chandler v. James, 985 F. Supp. 1094, 1100 (M.D. Ala. 1997); see

also Hodge v. Orlando Utils. Comm'n, No. 6:09-cv-1059, 2011 WL

250400, at *13 (M.D. Fla. Jan. 26, 2011) ("[T]he failure [of the

witnesses] to recall the meeting more than three years after it

occurred, without more, does not create a genuine issue

regarding whether the meeting actually occurred."); Linao v. GCR

Tire Ctrs., No. 2:09-cv-134, 2010 WL 4683508, at *5 (N.D. Ga.

---

Q: Mr. Perry, do you recall an email that was shown to Mr. Hendriksen on Friday from Darren, words to the effect of, Ronnie, our new rate's going to be $6 a unit. You've got plenty of time to think about it because it doesn't come due for, I don't know, 60 or 90 days?

A: No, I don't.

Q: You don't recall seeing that [at Hendriksen's deposition]?

A: [At the deposition], yes. I saw it [at the deposition], yes.

Q: Okay. So do you recall the email?

A: [From the deposition,] but not prior to that I don't, no.

Q: Would that be an example of an email from VRI that you would have? Would you have kept that or deleted that?

A: I don't have it in my records. I guess it was deleted.

Q: Okay.

A: If it was received, I guess it was deleted.

Q: Do you doubt that you received it?

A: I don't have - all I can say is I don't have it. I don't recall receiving it.

(Perry Dep. at 95-96.)

Nov. 12, 2010) ("[W]here the only evidence negating the existence of an event is a witness's failure to remember that event, other courts have declined to find a genuine issue of fact for summary judgment." (citing <u>Torjagbo v. United States</u>, 285 Fed. Appx. 615, 619 (11th Cir. 2008)). Like many other courts before it, this Court is unwilling and unable to find that Perry's failure to recall receiving notice, in and of itself, is sufficient to create a genuine issue of fact as to whether notice was actually given.

Furthermore, while Perry testified that he did not recall receiving the email, he also stated that Torrence mentioned the rate increase to him over phone. (Perry Dep. at 96.) More importantly, Perry admitted to never objecting to any invoice that reflected the increased rate of $6.00 per month (<u>id.</u> at 89) and the evidence shows that he continued making payments well after this fifty percent increase in pricing (<u>see</u> doc. no. 21, Ex. 1 at 20). According to Hendriksen, "at no time prior to Ronnie Perry's April 19, 2010 deposition did Life Alarm question the billing amounts, the application of payment or the balances owed as indicated by VRI in its billing, transaction histories and communications with Life Alarm." (Hendriksen Aff. ¶ 11.) Perry does not expressly dispute this. Rather, when asked if he ever communicated to VRI about his belief that he was being

billed an incorrect rate, Perry once again stated that he could not recall.[16]

In sum, Life Alarm has failed to provide sufficient evidence to overcome Defendants' motion for summary judgment as to Defendants' counterclaims for breach of the equipment leases and the Monitoring Agreement. Defendants have shown evidence that Plaintiff has defaulted on its financial obligations and owes VRI $54,269.89. In response, Plaintiff relies almost exclusively on conclusory statements contained in his affidavit that lack both factual and legal support. These conclusory statements are insufficient to create a genuine issue of material fact. See Sellers v. Am. Broad. Co., 668 F.2d 1207, 1210 n.3 (11th Cir. 1982) ("Conclusory statements, unsubstantiated by facts in the record, will normally be insufficient to defeat a motion for summary judgment."); see also Evers v. Gen. Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985) (same); Gordon v. Terry, 684 F.2d 736, 744 (11th Cir. 1982) (finding that conclusory allegations contained in an affidavit, unsupported by specific facts or representations, are

_____

[16] Opposing counsel asked Perry if he had any recollection of communicating to anyone at VRI that he believed he was being billed an incorrect rate, and Perry stated, "I can't recall whether I did or not at this time." (Perry Dep. at 99.) Opposing counsel went on to ask the following:

> Q: I'm saying if Mr. Torrence and Mr. Hendriksen at the trial over this matter testify that at no time did Mr. Perry ever object to the billing and say that there was an inaccurate billing rate, would those - can you say that those are untrue statements?
>
> A: I can't say.

(Id. at 100-101.)

insufficient to create genuine issue of material fact). Accordingly, Defendants' motion for summary judgment on their counterclaims for breach of the equipment leases and the Monitoring Agreement are hereby **GRANTED**.

### D. Defendants are entitled to an award of attorney's fees and costs pursuant to the equipment leases and the Monitoring Agreement.

In conjunction with their motion for summary judgment as to Life Alarm's breach of the equipment leases and the Monitoring Agreement, Defendants have also moved for summary judgment regarding their related claim for attorney's fees and costs. In opposition, Life Alarm argues that summary judgment on this issue is unwarranted because all claims and counterclaims in this case are ripe for trial not summary judgment. Life Alarm further contends that an award of attorney's fees is not proper here because the contracts at issue were products of unequal bargaining power.

Life Alarm's arguments are wholly without merit. The plain language of the leases and the Monitoring Agreement provide for an award of attorney's fees and costs resulting from another party's breach.[17] There is no genuine issue of material fact as to whether Life Alarm breached the contracts at issue and no genuine issue as to the extent of its breach. Therefore,

---

[17] See supra pp. 3-6.

summary judgment is appropriate as to VRI's claim for attorney's fees.

Life Alarm's attempt to avoid its contractual obligation by alleging there was "unequal bargaining power" is unsupported by any legal authority. Life Alarm essentially argues that its comparatively smaller size automatically creates a genuine issue of fact as to whether the contracts at issue are enforceable. Defendants correctly point out that the contracts that are the subject of this dispute are governed by Ohio law, which provides as follows as to the issue of unequal bargaining power:

> The evidentiary test for determining whether an environment of unequal bargaining power existed at the time of the contract execution requires analysis of two criteria. First, it must be shown that the contract at issue contains unreasonable provisions. Second, the party denying contract enforceability must show specific circumstances surrounding the execution of the contract that can be found to have prevented a voluntary meeting of the minds.

Sarefin v. Sky Bank, No. L-05-1091, 2006 WL 259618, at *5 (Ohio Ct. App. Feb. 3, 2006). There is no evidence showing that these requirements can be satisfied here. Moreover, the Court is unwilling to hold that a contracting company's relatively smaller size, without more, is enough to create a genuine issue as to a contract's enforceability. Accordingly, Defendants' motion for attorney's fees and costs incurred as a result of Life Alarm's breach of the equipment leases and the Monitoring Agreement is hereby **GRANTED**.

## IV. CONCLUSION

Based upon the foregoing, Defendants' motion for partial summary judgment (doc. no. 18) is hereby **GRANTED**. Accordingly, Plaintiff's motion for oral argument (doc. no. 26) is **DENIED AS MOOT**.

The Court notes that, in light of the decisions set forth herein, the only unresolved issues remaining in this case stem from Defendants' counterclaims. Before proceeding any further, Defendants are **ORDERED** to notify the Court within fourteen (14) days as to whether they intend to continue pursuing their remaining claims.

**ORDER ENTERED** at Augusta, Georgia, this 28th day of March, 2011.

_____
HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA